UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HUB INTERNATIONAL NORTHWEST LLC,<br><br>　　　　　　Plaintiff(s),<br>　v.<br>SHAWNA LARSON & JOHN DOE LARSON,<br><br>　　　　　　Defendant(s). | CASE NO. 2:22-cv-01418-TL<br><br>ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |

This matter is before the Court on Plaintiff's motion for a temporary restraining order (the "TRO Motion"). Dkt. No. 14. Having considered the relevant record and finding oral argument unnecessary, the Court hereby DENIES the TRO Motion for the reasons below.

## I.　BACKGROUND

Plaintiff HUB International Northwest LLC ("HUB"), an insurance brokerage business, brings this action against Defendants Shawna Larson, a former employee of HUB, and "John Doe Larson," the unknown spouse of Ms. Larson. Dkt. No. 1-1 at 2–3. HUB alleges that, during her employment with HUB, Ms. Larson executed a non-solicitation agreement (the "Non-

Solicitation Agreement"), which in part prohibited Ms. Larson from soliciting HUB's employees for up to two years after termination of her employment (Section 5(b)) and from soliciting HUB's other employees for up to one year after termination of her employment (Section 5(c)). *Id.* at 3–4. The Non-Solicitation Agreement also prohibited Ms. Larson from using or disclosing trade secrets or other confidential or proprietary information (Section 3), which HUB alleges includes such information as who at HUB's clients handle insurance procurement, what types of insurance the clients purchased, who the insurance carriers were, and when the policies renewed. *Id.* at 4–6.

HUB alleges that, following her resignation in early August 2022, Ms. Larson joined Alliant Insurance Services, Inc. ("Alliant"), solicited certain of HUB's clients (with the use of HUB's confidential information) on August 11, and tried to recruit one of HUB's employees (through an Alliant employee) on August 16. *Id.* at 6–7. On August 17, HUB's in-house counsel sent a letter to Ms. Larson outlining her continuing obligations under the Non-Solicitation Agreement. *Id.* at 7. Nonetheless, on August 25, Ms. Larson allegedly used HUB's proprietary and confidential marketing materials in a virtual networking and educational event during her keynote speech. *Id.* at 7. On September 19, HUB was informed that one of its clients was transferring its business to Alliant. *Id.* HUB believes that Ms. Larson continues to try to solicit other HUB clients for their business. *Id.* at 7–8.

Based on these alleged solicitation attempts and uses of confidential and proprietary information, HUB brings claims of breach of the Non-Solicitation Agreement, tortious interference, and violation of the Washington Uniform Trade Secrets Act, RCW 19.108.010. *Id.* at 8–10. HUB seeks injunctive relief, compensatory damages, punitive damages, and fees and costs. *Id.* at 11.

1    Defendants removed this action from King County Superior Court. Dkt. No. 1. On
2    October 19, HUB moved for a temporary restraining order ("TRO") to enjoin Ms. Larson from
3    contacting or soliciting HUB's clients, enjoin Ms. Larson from contacting or soliciting HUB's
4    employees, direct Ms. Larson from returning all copies of HUB's confidential, proprietary, or
5    trade secret information in her possession, and enjoin Ms. Larson from using any such
6    information. Dkt. No. 14 at 1–2. Ms. Larson opposes. Dkt. No. 18.
7    No reply brief being permitted under Local Civil Rule 65(b)(5), the TRO Motion is fully
8    briefed and ripe for the Court's consideration.

## II.    LEGAL STANDARD

A TRO, as with any preliminary injunctive relief, is an extraordinary remedy that is "never awarded as of right." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a TRO must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of the preliminary relief; (3) a balancing of equities tips in favor of the injunction; and (4) the injunction is in the public interest. *Id.* at 20; *see Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the analysis for a TRO and a preliminary injunction are substantially identical), *overruled on other grounds by Winter*, 555 U.S. 7.

All four *Winter* elements must be satisfied. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022); *see also Winter*, 555 U.S. at 20–22 (rejecting an approach that permitted mere "possibility" of irreparable harm if there is a strong likelihood of success on the merits). However, the Ninth Circuit permits a "sliding scale" approach as to the first and third factors: "[W]hen the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits,'" rather than showing a likelihood of success on the merits. *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th

ORDER ON PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING
ORDER - 3

Cir. 2011))); *Cottrell*, 632 F.3d at 1134–35 (holding that, after *Winter*, the "serious question" sliding scale survives in the Ninth Circuit, provided that the other two elements are also shown).

### III. DISCUSSION

HUB argues that it is entitled to a TRO because it meets all four *Winter* factors. Dkt. No. 14 at 6–9.[1] The TRO Motion is accompanied by two supporting declarations:

- The declaration of Karissa Way-Hamm, the Account Manager for Kaso Plastics, Inc. ("Kaso"), a former HUB client who worked with Ms. Larson, which states that HUB learned on October 7 that Kaso was terminating its relationship with HUB. Dkt. No. 15 at 1. Ms. Way-Hamm states, "We believe that Kaso has transferred its business to Shawna Larson at Alliant . . . ." *Id.* at 2.

- The declaration of Michael Taylor, the Senior Executive Vice President, Mountain and Northwest Sales Leader at HUB, which largely reiterates the allegations of the Complaint, including those regarding Ms. Larson's execution of the Non-Solicitation Agreement, her resignation from HUB, her subsequent employment at Alliant and alleged solicitation of HUB's clients, his belief that an employee was contacted at the direction of Ms. Larson to terminate her relationship with HUB and begin working for Alliant, the August 17 letter from HUB's in-house counsel, Ms. Larson's purported usage of HUB's proprietary and confidential information at a August 25 event, and the transfer of a HUB client's business to Alliant. Dkt. No. 16 at 1–3.

Defendant Ms. Larson opposes, arguing that the TRO Motion should be denied because HUB: (1) waited two-and-half months to file its lawsuit and then another two weeks after the filing of the lawsuit before moving for a TRO, despite claiming to be at danger of suffering immediate harm; (2) conjectures but does not provide meaningful evidence of improper solicitation or misuse of confidential information; and (3) cannot show it will suffer irreparable harm (as opposed to losses that can be recovered as monetary damages). Dkt. No. 18 at 1–2, 3–4.[2] Ms. Larson also provides three supporting declarations:

---

[1] HUB also argues that it should not be required to post a bond if the TRO Motion is granted. Dkt. No. 14 at 9–10. As the Court denies the TRO Motion, this argument is moot.

[2] Ms. Larson also argues that the TRO Motion should be denied because HUB failed to comply with the Court's Standing Order for All Civil Cases, which requires a meet and confer with opposing counsel three days before filing

ORDER ON PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING
ORDER - 4

- The declaration of Damon C. Elder, counsel for Ms. Larson, which in most relevant part states that HUB never notified Mr. Elder of its intent to file the TRO Motion, as well as that counsel for HUB learned from an auto-reply that Mr. Elder was out of office and then, just over six hours later, HUB filed the TRO Motion. Dkt. No. 19 at 2.

- The declaration of Defendant Ms. Larson, which represents that Ms. Larson notified some of her HUB clients at the time of her resignation that she was leaving and told any clients who asked about her next role that she was not in a position to solicit their business. Dkt. No. 20 at 3. She notes that the revenue from the five former and current HUB clients identified in the Complaint and TRO Motion (and supporting papers) represent a "miniscule" portion of HUB's total business, and that certain of HUB's clients expressed concerns about HUB's quality of service during her time at HUB. *Id.* at 3–4. Ms. Larson also represents that she did not direct Alliant to recruit a HUB employee, as alleged in the Complaint. *Id.* at 1. Finally, Mr. Larson states that she did not take, and has not used, any confidential information from HUB after her resignation and asserts that such information as who at HUB's clients handle insurance procurement, what types of insurance the clients purchased, who the insurance carriers were, and when the policies renewed are not confidential information but are publicly available. *Id.* at 2.

- The declaration of Melissa Adams-Cauble, the Accounting Manager for Sussman Shank LLP, a mid-sized law firm and client of HUB, which states that on August 11, Ms. Larson notified Ms. Adams-Cauble of her departure from HUB in a courtesy call that did not involve any solicitation of Sussman's business. Dkt. No. 21 at 1–2.

The Court has reviewed the Parties' briefing, supporting declarations, and the remainder of the relevant record and finds oral argument unnecessary.

A.  **Likelihood of Success on the Merits**

HUB has failed to show, at this early stage of the litigation, a likelihood of success on the merits. At the heart of HUB's claims and allegations against Ms. Larson is the accusation that she has (and will) engage in the following: (1) soliciting HUB's clients; (2) soliciting HUB's

---

a non-dispositive motion. *See* Judge Tana Lin, Standing Order for All Civil Cases § II.D (last updated Apr. 26, 2022), https://www.wawd.uscourts.gov/sites/wawd/files/LinStandingOrderreCivilCases_0.pdf. But because a TRO is ordinarily an urgent matter that cannot always accommodate the three-day meet-and-confer requirement, the Court declines to deny the TRO Motion on this basis alone. The Court is troubled, however, by the suggestion that HUB may have engaged in gamesmanship by filing the TRO Motion on a day when it knew defense counsel was out of office for travel. *See* Dkt. No. 18 at 13–14.

employees; and (3) using HUB's confidential or proprietary information, in spite of the Non-Solicitation Agreement. But HUB has failed to show a likelihood that Ms. Larson has in fact engaged (or will engage) in such acts.

While HUB alleges that Ms. Larson "solicited" a number of HUB's clients' businesses (Dkt. No. 1-1 at 6), such allegations are conclusory and speculative. HUB's supporting declarations for the TRO Motion do not provide any further detail or support: Ms. Way-Hamm's declaration, for example, states that, "We *believe* that Kaso transferred its business to Shawna Larson at Alliant . . . ." Dkt. No. 15 at 2 (emphasis added). Mr. Taylor's declaration, too, only repeats the conclusory assertions that Ms. Larson "began using HUB's confidential information to solicit HUB clients" and that Ms. Larson "contacted and solicited . . . two current HUB clients[] to persuade them to cancel their business with HUB and transfer their business to Alliant." Dkt. No. 16 at 2. Mr. Taylor does not indicate how he has come to know of these conclusory assertions; indeed, upon noting that HUB was informed by a client, APCAC, that it was transferring its business to Ms. Larson and Alliant, he states, "We *believe* that [Ms.] Larson used HUB's confidential information . . . to solicit APCAC to transfer its business to Alliant." *Id.* at 3 (emphasis added). While presented in the form of factual declarations, there is no indication that these are actual facts within the declarants' knowledge rather than speculation based on—at most—light circumstantial evidence.[3]

Indeed, Ms. Larson vigorously disputes that any such solicitation occurred, and affirmatively states in factual declarations submitted both by Ms. Larson herself and a current

---

[3] Ms. Larson asks the Court to strike portions of HUB's declaration as speculative and not based on personal knowledge. Dkt. No. 18 at 4–5; *see also* Dkt. No. 20 at 3 (stating that Ms. Way-Hamm and Mr. Taylor were not present for Ms. Larson's courtesy calls with HUB's clients notifying them of her departure from HUB). Because the Court disregards these conclusory and speculative statements in HUB's supporting declarations, however, this request is moot.

ORDER ON PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING
ORDER - 6

HUB client that Ms. Larson only provided courtesy calls to clients to notify them of her departure and avoided any solicitation of their business. Dkt. Nos. 20, 21. There is no evidence, as far as the Court can tell, of Ms. Larson's own involvement in these transfers of business, much less her solicitation of their business in breach of the Non-Solicitation Agreement. And while discovery may ultimately prove otherwise, there is an insufficient showing of solicitation of HUB's clients at this juncture to find a likelihood of success on the merits for HUB.

Similarly, HUB's assertion that Ms. Larson engaged in the improper solicitation of HUB's employees is also unsupported. Mr. Taylor's declaration openly speculates, "We *believe* that [Alliant] contacted [a HUB employee] at the direction of [Ms.] Larson to persuade [the HUB employee] to terminate her relationship with HUB and to begin working for Alliant." Dkt. No. 16 at 2 (emphasis added). The Court cannot accept such speculation as fact, especially when Ms. Larson again vigorously disputes that she directed Alliant to recruit the HUB employee—or that she has any intention of doing so. Dkt. No. 20 at 1.

Finally, as for the misuse of any confidential or proprietary information, HUB's allegations and related materials are yet again conclusory and unsupported. Tellingly, HUB does not provide any details of the allegedly confidential information that Ms. Larson used during the August 25 virtual networking event, only vaguely repeating that she "used HUB's proprietary and confidential marketing materials and intellectual property as a part of her presentation." Dkt. No. 16 at 2. HUB does not represent, for example, that Ms. Larson used HUB's list of clients or details of their contracts with HUB—or any other information that might be construed as confidential or proprietary information. Further, Ms. Larson also emphasizes that she retained none of HUB's confidential or proprietary information following her resignation and that she has only used Alliant's materials or publicly available information in subsequent communications, including at the August 25 event. Dkt. No. 20 at 2. There is, therefore, insufficient evidence that

any misuse of confidential or proprietary information has occurred or will likely occur. Again, it is possible that discovery may prove otherwise—and any misrepresentations to the Court will be sanctioned as appropriate—but at this stage of the litigation, HUB has not shown a likelihood of success on the merits sufficient to warrant the extraordinary relief of a TRO.

B.  The Sliding Scale

While the failure to show one *Winter* factor (here, a likelihood of success on the merits) would ordinarily defeat a TRO, it is possible under the "sliding scale" approach in the Ninth Circuit to nonetheless proceed if the balance of equities (the third *Winter* factor) tips *sharply* in HUB's favor, provided that HUB still demonstrates "serious questions going to the merits" as well as the two remaining *Winter* factors. *See Cottrell*, 632 F.3d at 1132. Here, however, the balance of equities does not tip in favor of HUB.

In weighing the balance of the equities, courts look to the harm to the parties. However, here, HUB has not demonstrated any harm that it would suffer in the absence of a TRO that rises above the speculative level—indeed, Ms. Larson credibly represents that she has been careful to avoid soliciting any HUB clients or employees, that the few named HUB clients represent a "miniscule" portion of HUB's overall business, and that she has no confidential or proprietary information belonging to HUB (and therefore could not misuse such information). Ms. Larson's statements are supported by one of HUB's own clients, who represents that Ms. Larson, indeed, did not solicit the client's business during her courtesy call informing it of her departure from HUB. On the other hand, HUB provides no evidence that even the speculative future loss of

ORDER ON PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING
ORDER - 8

HUB clients to Alliant would be a significant loss to HUB, or even that the loss of some clients to a competitor would be abnormal in the ordinary course of business.[4]

Accordingly, HUB has failed to show that the balance of equities tips in its favor—much less that the balance tips *sharply* in its favor.

## IV. CONCLUSION

HUB neither satisfies all four *Winter* factors[5] nor demonstrates on a sliding scale that it should receive the relief it seeks. Because the Court finds that HUB has failed to show a likelihood of success on the merits or that the balance of equities tips sharply in HUB's favor, the TRO Motion (Dkt. No. 14) is hereby DENIED.

Dated this 25th day of October 2022.

Tana Lin
United States District Judge

---

[4] The Court also notes that HUB has failed to argue or show that any harm it would suffer would be *irreparable*, rather than—for example—a loss of revenue that can be compensated with damages. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[M]onetary injury is not normally considered irreparable." (alteration in original) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980))); *see also ACT 898 Prods., Inc. v. WS Indus., Inc.,* 774 F. App'x 1012, 1016 (9th Cir. 2019) ("[An] economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." (quoting *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991))).

[5] As HUB fails on the first *Winter* factor, or likelihood of success on the merits, the Court does not reach the remaining factors other than in the context of the sliding scale analysis.

ORDER ON PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING
ORDER - 9